UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Kevin M. Brown,                :
        Plaintiff,             :
                               :
v.                             :      Case No. 3:05cv606 (JBA)
                               :
Daniel Aybar and               :
Carmen Mallamaci,              :
        Defendants.            :

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. # 20]

Plaintiff Kevin M. Brown instituted this civil action for damages pursuant to 42 U.S.C. § 1983 against defendants City of Waterbury Fire Marshal Carmen Mallamaci and City of Waterbury Deputy Fire Marshal Daniel Aybar, alleging that they deprived him of his Fourth Amendment rights when they caused him to be arrested on July 1, 2002, and subsequently maliciously prosecuted him, for violations of state laws and regulations concerning the storage of flammable and/or combustible materials at the West Side Middle School in Waterbury Connecticut.  See First Amended Complaint [Doc. # 3].  Defendants move for summary judgment on all counts contending that probable cause existed to arrest plaintiff, that there are no facts in the record to support plaintiff's claims that defendants acted with malice for a purpose other than bringing an offender to justice, and on the grounds that defendants are entitled to qualified immunity and/or immunity from personal liability for acts constituting official duties pursuant to Conn. Gen. Stat. § 29-298.  For the reasons

1

that follow, defendants' motion will be DENIED.

## I.   FACTUAL BACKGROUND

The following relevant facts are undisputed unless otherwise noted.  On May 16, 2002, the Waterbury Fire Marshal's Office received a complaint that excessive amounts of gasoline were being stored at Westside Middle School in a location under the school's library.  In response to this complaint, defendant Aybar and Fire Inspectors Shawn McKay and Joseph Conway went to the School to investigate and, upon arrival, met with the School Principal, Paul Ciochetti.  Ciochetti directed the officers to a room which he told them the plaintiff used to repair engines, but informed them that only the plaintiff and his assistant, Larry Scarpa, had keys to the room.  At that point, Ciochetti contacted plaintiff – who was not on School grounds at the time – to report to the School to provide access to the room.  Plaintiff arrived at the School and unlocked the door to the room, where the officers and Ciochetti were met with a strong odor of gasoline.

Although the precise amounts are disputed, it is not contested that once inside the room, the officers observed containers of gasoline and diesel fuel, along with equipment including an acetylene torch and lawn mowers.  The officers also observed outside the school building adjacent to the engine repair room three 55-gallon drums containing pesticide and a large storage trailer housing snow blowers, lawn mowers, and

other equipment, which also exuded a strong smell of gasoline.
At some point during the officers' inspection of the School,
defendant Aybar telephoned defendant Mallamaci and requested that
he join them.  Subsequent to his arrival, Mallamaci observed the
items described above, concluded that the engine repair room had
improper ventilation and was therefore unsafe (with the potential
to cause an explosion), and ordered the immediate removal of all
items from the room.

An investigation was subsequently conducted to determine
whether there were any fire code or other regulatory violations
or criminal offenses that had occurred as a result of the
conditions observed at the School on May 16, 2002.  As part of
this investigation, Detective Jeffrey Fisher of the Waterbury
Police Department obtained sworn statements from plaintiff,
Lawrence Scarpa, and Herbert Greengas, the school inspector.
Principal Ciochetti also submitted an affidavit and a memorandum
as part of this investigation, and defendant Aybar and Fire
Inspector McKay submitted reports.  Mallamaci testified in his
affidavit that he read all of these documents before submitting
an affidavit for an arrest warrant for plaintiff and relied on
them in drafting his affidavit, and he indicated that the
statements of plaintiff, Scarpa, Greengas, and Ciochetti, along
with other documentation, were included with the warrant
application.  Mallamaci Aff. [Doc. # 20-7] ¶¶ 15-40, 43, 46.

3

The reports of Aybar and McKay state, <u>inter alia</u>, that upon their arrival at the Westside Middle School, principal Ciochetti directed them to the engine repair room, but that Ciochetti had to contact plaintiff for access because he did not have a key to the room.  <u>See</u> Aybar Report [Doc. # 20-5, Ex. C]; McKay Report [Doc. # 20-5, Ex. E].  These reports also described the materials observed upon entering the room and that, after they gained access to the room, Larry Scarpa and Frank Catalina, a school employee, arrived.  <u>Id</u>.  Ciochetti's memorandum to Detective Fisher corroborates that on May 16, 2002, Aybar came to the School to conduct an inspection and that Ciochetti told Aybar that only plaintiff and Scarpa had access to the garage and he had his secretary contact plaintiff to open the door; Ciochetti also gave Aybar his all-access "ASSA" key, which did not work. Ciochetti Mem. [Doc. # 20-6, Ex. G].  Additionally, Ciochetti stated in his memorandum that when he was first appointed Principal for the September 2000-2001 school year, plaintiff told Ciochetti that "he was in charge of small engine repair in the garage as well as [West Side Middle School] during the day. . . . As [Ciochetti] got to know the building over time, [he] inquired about keys for room 105 and the garage. [He] was told that those were only for Kevin Brown and Larry Scarpa. . . . Herb Greengas went so far as to say that he gave that room (105) to Kevin Brown."  <u>Id</u>.  The sworn statement of Herbert Greengas (the School

Inspector of the City of Waterbury) also corroborated the fact
that, to his knowledge, only plaintiff and Scarpa had access to
the engine repair room.  Greengas Statement [Doc. # 20-11, Ex.
J].  Greengas also stated that plaintiff was "responsible for the
day to day activities and work schedules of [the 14] employees
[at West Side Middle School]," and that plaintiff was also
responsible for supervision of the garage at the School "that is
used to repair and store equipment that is used in the
maintenance and upkeep of school grounds."  Id.  Greengas further
detailed two memoranda he sent to City of Waterbury custodians in
1998 stating that "there is to be no gasoline stored within any
buildings" and directing "employees to remove the gasoline from
the schools."  Id.

Larry Scarpa's sworn statement provides that he and
plaintiff work at the "repair garage" at West Side Middle School
and that plaintiff is his supervisor.  Scarpa Statement [Doc. #
20-7, Ex. I].  As far as Scarpa knows, he and plaintiff are the
only two people with keys to room # 105.  Id.  Further, Scarpa
stated that both plaintiff and Greengas were "aware of the
storage of gasoline inside th[e] garage," although he "believe[d]
that Herb [Greengas] did not know the amount of gasoline stored
inside the garage."  Id.  Specifically, Scarpa stated that on May
13, 2002, he informed plaintiff that he "was going to central
supply to get gasoline for the weeks' lawn maintenance for the

schools" and that he "then loaded the empty 4 15 gallon containers into a city pick-up truck and drove to central supply. Once there [he] filled each of the containers with approximately 14 gallons of gasoline into each container.  After putting the tops back onto each container and making sure they were secure in the bed of the pick-up truck [he] drove back to the garage and unloaded the containers and stored them inside the garage."  Id.

Plaintiff's sworn statement[1] indicates that he works for the City of Waterbury Board of Education as a "custodian II," and that he was stationed at West Side Middle School for almost 7 years, but that prior to the incident he had been given a new job assignment to run the garage that oversees the maintenance of all the school grounds, which garage is located inside the building at West Side Middle School.  Pl. Statement [Doc. # 20-11, Ex. K]. Before appointment to this new position, plaintiff was a custodian at West Side Middle School and was in charge of all the custodians that worked inside the school and also purchased and issued supplies, which were stored in room # 105.  Plaintiff stated that he and Larry Scarpa were the only two City employees with a key to the storage room.  Plaintiff also set out that

---

[1] Plaintiff testified in his deposition that he cannot read and thus that he did not read this statement before he signed it; when asked how the statement "came into being," plaintiff responded that certain individuals "had a hearing [and] they decided to come out with this."  Pl. Dep. at 72 [Doc. # 29-5, Ex. I].

around April 25, 2002, he underwent surgery on his shoulder and was out of work, that the same time was given his new job assignment "to supervise the employees that were responsible for the maintenance of school property," but that when he returned to work from his surgery leave he was on light duty and was thus working in the office of the School Inspector, Mr. Greengas.  Id. Notwithstanding that plaintiff was on light duty, however, plaintiff stated that on May 13, 2002, Scarpa called and told him that he was going to purchase gasoline, and plaintiff knew that Scarpa "used the plastic containers that I keep in the shop," which "hold about 15 gallons in each [and] there were 4 containers in all.  We use these containers to store gasoline in when we plan to cut alot [sic] of grass at the schools."  Id.

Also in connection with the investigation, a Connecticut State Fire Code Abatement Order of Fire/Life Safety Hazards was issued by Inspector McKay on June 3, 2002, which lists the violations that were found as a result of the inspection at West Side Middle School on May 16, 2002.  The Waterbury public schools had been inspected periodically for compliance with the state regulations in 1993, 1997, 1998, 1999, and 2000 and written notices of violations had been sent to school officials in each of those years, containing orders to remove all flammable and combustible liquids improperly stored in buildings.

On July 1, 2002, defendant Fire Marshal Mallamaci submitted

an affidavit/application for an arrest warrant for the plaintiff, which was approved by a judge of the Connecticut Superior Court, stating facts that he believed constituted probable cause to arrest the plaintiff for reckless endangerment in violation of Conn. Gen. Stat. § 53a-63 and violations of regulations concerning flammable or combustible liquids under Conn. Gen. Stat. § 29-320.  Warrant Affidavit/Application [Doc. # 20-4].

The facts set forth in the affidavit included: (1) that previous violations had been issued to the Waterbury public schools for improperly stored flammable and combustible liquids; (2) that on May 16, 2002, the Fire Marshal's Office received a report concerning excessive amounts of gasoline being stored at Westside Middle School; (3) that defendant Aybar, McKay, and Conway went to investigate and spoke with Principal Ciochetti, who informed them that the gasoline "might probably be stored in a room in the lower level that custodian Kevin Brown uses to repair engines;" (4) that Ciochetti told them that he did not have a key to the room and that plaintiff and his assistant Larry Scarpa were the only ones that had keys to the room; (5) that, after plaintiff arrived and opened the room, they were met with a strong smell of gasoline and observed containers storing gasoline, diesel, and other flammable or combustible liquids; (6) that defendant Aybar called Mallamaci to respond, which he did, and upon arrival he also observed the containers, found that the

room had improper ventilation, and immediately ordered the
materials removed.  <u>See</u> <u>id</u>.  The application also included the
statements of the plaintiff, Scarpa, Greengas, and Ciocetti.[2]
After the warrant application was approved, plaintiff was
arrested.

Defendant Mallamaci states that he reviewed the statements,
affidavits, and reports that were submitted prior to preparing
the warrant application.  Plaintiff contends that the only
information and/or knowledge the defendants possessed at the time
they secured a warrant for his arrest was contained in the
warrant itself, citing defendants' interrogatory responses which
state that "[t]he facts that would establish probable cause . . .
are contained in the Affidavit," <u>see</u> Mallamaci First
Interrogatory Responses [Doc. # 24] ¶¶ 8-9; Aybar First
Interrogatory Responses [Doc. # 25] ¶¶ 8-9; Mallamaci Second
Interrogatory Responses [Doc. # 26] ¶¶ 5-6; Aybar Second
Interrogatory Responses [Doc. # 27] ¶¶ 5-6, but do not state that
the affidavit contains all of the information known to defendants
at the time the warrant application was submitted.

Plaintiff states in his affidavit and in his responses to

---

[2] Plaintiff disputes that these materials were included in
the application, noting that the box on the application for
"affidavit(s) attached" is not checked.  However, the "affidavit
below" box is checked, <u>see</u> Warrant Affidavit/Application, and
Mallamaci testified that these materials were included, <u>see</u>
Mallamaci Aff. [Doc. # 20-7] ¶ 46.

defendants' interrogatory requests that at all relevant times
defendants knew, because he told them, that he: (1) was not
working at West Side Middle School at the time of the alleged
violations and for approximately 11 weeks prior to that date; (2)
had been out of work entirely from March 2002 to May 10, 2002 for
shoulder surgery and was placed on restricted duty in the School
Inspector Office upon his return; (3) had been on restricted
assignment for six weeks prior to March 2002 which work did not
involve accessing the West Side Middle School facilities or
grounds; (4) was never responsible for the functions, operations,
personnel and services related to the operation of the West Side
Middle School or for the overall supervision of the maintenance
and repair of school buildings, grounds, and related equipment;
(5) was not the supervising custodian at West Side Middle School
at the time the alleged violations were discovered and had been
on restricted assignment for the City of Waterbury; and (6) was
never in charge of nor participated in the ordering or storing of
gasoline/petroleum products at the West Side Middle School and
that other employees of the City were in charge of and performed
those functions. See Pl. Aff. [Doc. # 28] ¶¶ 4-9; accord Pl.
Interrogatory Responses [Doc. # 29-3] ¶ 11.  Plaintiff also
stated in interrogatory responses that he was told by defendants:
(1) that he was "not going to get in trouble for anything.  Don't
worry about it;" (2) that "someone is going to have to take the

10

fall for this, because this is not allowed;" and (3) that
"irregardless of guilt, [defendants] delivered two names to the
Mayor's Office from which the Mayor's Office could pick from
[sic], of who was going to 'take the fall' for the alleged legal
violations. . . . And further that the Mayor's Office picked and
returned [plaintiff's] name to them and that that is the reason
why [he] was being prosecuted."  Pl. Interrogatory Responses ¶
11.  Mallamaci omitted this information from his warrant
affidavit, and also neglected to include the fact that Scarpa
corroborated plaintiff's statement that Scarpa was the one who
purchased the hazardous materials and stored them at the School.

## II.   STANDARD

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with affidavits . . . show that there is no genuine
issue as to any material fact and that the moving party is
entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(c).  A party seeking summary judgment "bears the burden of
establishing that no genuine issue of material fact exists and
that the undisputed facts establish [its] right to judgment as a
matter of law."  Rodriguez v. City of N. Y., 72 F.3d 1051, 1060
(2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144,
157 (1970)).  "The duty of the court is to determine whether
there are issues to be tried; in making that determination, the

11

court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Id. (citations omitted). "If reasonable minds could differ as to the import of the evidence . . . and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal quotation, citation, and alteration omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (internal quotation and citation omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied by pointing to an absence of evidence to support an essential element of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It

need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" <u>Parker v. Sony Pictures Entm't, Inc.</u>, 260 F.3d 100, 111 (2d Cir. 2001) (quoting <u>Celotex</u>, 477 U.S. at 324); <u>see also</u> <u>Gallo v. Prudential Residential Servs. Ltd. P'ship</u>, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").  The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").  In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion.  <u>Matsushita</u>, 475 U.S. at 587. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient.  <u>Matsushita</u>, 475 U.S. at 586 (citations omitted).

## III. DISCUSSION

### A.    Probable Cause and the Corrected Affidavit Doctrine

Claims for false arrest and malicious prosecution under
Section 1983 are governed by state law.  See Grimm v. Krupinsky,
No. 04-2913-CV, 2005 WL 1586978 (2d Cir. July 7, 2005) (citing
Davis v. Rodriquez, 364 F.3d 424, 433 (2d Cir. 2004)).  Under
Connecticut law, an absence of probable cause is an essential
element of both claims.  See id. (citing Davis, 364 F.3d at 433,
and McHale v. W.B.S. Corp., 187 Conn. 444, 447 (Conn. 1982)).
"Probable cause to arrest exists when the arresting officer has
knowledge or reasonably trustworthy information of facts and
circumstances that are sufficient to warrant a person of
reasonable caution in the belief that the person to be arrested
has committed or is committing a crime."  Escalara v. Lunn, 361
F.3d 737, 743 (2d Cir. 2004) (internal quotation and citation
omitted).  Further, even if actual probable cause is not found to
have existed, an arresting officer will be entitled to qualified
immunity if there was "arguable probable cause" for the arrest.
Id.  The Second Circuit has defined "arguable probable cause" as
follows:

> Arguable probable cause exists if either (a) it was
> objectively reasonable for the officer to believe that
> probable cause existed, or (b) officers of reasonable
> competence would disagree on whether the probable cause
> test was met.

Id.

"'The quantum of evidence required to establish probable
cause to arrest need not reach the level of evidence necessary to

support a conviction.'" <u>Cohen v. Dubuc</u>, No. 99cv2566 (EBB), 2000
WL 1838351, at *4 (D. Conn. Nov. 28, 2000) (citing <u>United States
v. Fisher</u>, 702 F.2d 372, 371 (2d Cir. 1989)).  It is well
established that when information "sufficient to warrant a person
of reasonable caution in the belief that an offense has been
committed by the person to be arrested" is received from a
putative victim or eyewitness, probable cause exists absent
circumstances that raise doubts as to the individual's veracity.
<u>See</u> <u>Curley v. Suffern</u>, 268 F.3d 65, 70 (2d Cir. 2001); <u>Martinez
v. Simonetti</u>, 202 F.3d 625, 634 (2d Cir. 2000); <u>Singer v. Fulton
County Sheriff</u>, 63 F.3d 110, 119 (2d Cir. 1995); <u>see</u> <u>also
Illinois v. Gates</u>, 462 U.S. 213, 233-34 (1983) ("[I]f an
unquestionably honest citizen comes forward with a report of
criminal activity – which if fabricated would subject him to
criminal liability – we have found rigorous scrutiny of the basis
of his knowledge unnecessary.").  Indeed, "probable cause can
exist even where it is based on mistaken information, so long as
the arresting officer acted reasonably and in good faith in
relying on that information."  <u>Bernard v. United States</u>, 25 F.3d
98, 102 (2d Cir. 1994).

"Normally, the issuance of a warrant by a neutral
magistrate, which depends on a finding of probable cause, creates
a presumption that it was objectively reasonable for the officers
to believe that there was probable cause, . . . and a plaintiff

15

who argues that a warrant was issued on less than probable cause faces a heavy burden." Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991). Thus, because in this case a warrant was issued for plaintiff's arrest, "the plaintiff must make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was necessary to the finding of probable cause." Id.; accord Loria v. Gorman, 306 F.3d 1271, 1289 (2d Cir. 2002) ("The right Loria alleges was violated can be particularized as the right to be free from an arrest based on a warrant that would not have been issued if the officer seeking the warrant had disclosed to the issuing magistrate information within the officer's knowledge that negated probable cause. . . . To allege a violation of that clearly established right, [plaintiff] must demonstrate both that [defendant] intentionally or recklessly made false statements in the warrant application and that those statements were necessary to a finding of probable cause."). The same standard applies to claimed intentional or reckless omissions of material information and, accordingly "[w]here an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, as where a material omission is intended to enhance the contents of the affidavit as support for a conclusion of probable cause, .

. . . the shield of qualified immunity is lost." Golino, 950 F.2d 864.

Application of this standard "has come to be known as the 'corrected affidavits doctrine'" and "[u]nder this doctrine, [courts] look to the hypothetical contents of a 'corrected' application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law." Escalera, 361 F.3d at 743-44; accord Loria, 306 F.3d at 1289 ("We assess the materiality of alleged misstatements in a warrant application by putting aside allegedly false material, supplying any omitted information, and then determining whether the contents of the corrected affidavit would have supported a finding of probable cause. . . . If the corrected affidavit would be sufficient to support probable cause as a matter of law, no constitutional right was violated and the defendant officer is entitled to summary judgment.").

**B.   False Arrest**

Thus, applying the corrected affidavit doctrine, defendants must demonstrate an absence of material fact as to whether: (1) material representations or omissions were intentionally or recklessly made in the warrant application; and (2) that those representations or omissions were necessary to (or would have negated) a finding of probable cause.

17

Focusing first on the second element and performing the "corrected affidavit" analysis, plaintiff claims that defendants knew, because he told them on the day of the incident at West Side Middle School, that he had not been working at the School for the 11 weeks beforehand due to his surgery and that, upon return to work from his surgery, he was assigned to restricted duty in Herb Greengas's office.  Brown Aff.[Doc. # 28, Ex. F] ¶¶ 4-6.  He also states that he told defendants that he was not the supervising custodian at the School at the time of the alleged violations, was never in charge of or participated in the ordering of storing gasoline or petroleum products at West Side Middle School, and that he was not responsible for the functions, operations, personnel, or services related to the operation of the School.  Id. ¶¶ 7-9.  Plaintiff also corroborated Scarpa's statement that Scarpa was the one who purchased the hazardous materials and stored them at the School.  Additionally, plaintiff claims that "many people had access to the room/garage for one (1) year prior to [his] arrest" and that defendants are aware of this because the Fire Department itself "possesses its own set of 'ASSA Keys,' which open the door to the room/garage where improper amounts of flammable and/or combustibles were allegedly discovered on May 16, 2002."  Id. ¶ 3.

Plaintiff's argument, therefore, is that this information implicates Scarpa and exculpates him, showing his lack of

responsibility and involvement in the ordering/storing of materials at the School and absence from work for several weeks before the alleged incident, and identifying as inaccurate the statement that plaintiff and Scarpa were the only two individuals with access to the room and garage, and that this information was material and thus improperly omitted from the warrant application.

Notwithstanding that Mallamaci was not obligated to conduct an exhaustive investigation, or more thoroughly examine plaintiff's claimed alibi, this information was before Mallamaci in the form of sworn statements and memos and from conversations he had with plaintiff at the scene and, taken in the light most favorable to the plaintiff, this information was materially relevant to the probable cause determination because it relates to plaintiff's responsibility and involvement in the improper storage of flammable and combustible materials at the School and implicates an individual other than plaintiff (Scarpa) as the perpetrator of the violations.  Consideration of this information along with the other information contained in the warrant application does not support an objectively reasonable conclusion that probable cause existed to arrest plaintiff because the omitted information suggests that plaintiff had not been on School grounds for many weeks, was not responsible for or involved in the purchasing or storing of flammable or combustible

materials, and that other individuals were knowledgeable about and responsible for these activities (and had access to the engine repair room where the materials were discovered).

Further, reading the evidence in the light most favorable to the plaintiff, although Mallamaci states in his affidavit that plaintiff's sworn statement was included in the warrant application, and in that statement plaintiff provides both that he and Scarpa were the only two individuals with access to the room/garage and that he did have some degree of responsibility over the purchase and storage of hazardous materials and over the other custodial employees at the School around the time the violations were discovered, in light of plaintiff's testimony that he cannot read, and thus did not read his statement before signing it, jurors could find Mallamaci was not justified in relying on the representations in the sworn statement, particularly because it was contradicted by plaintiff's oral statements at the scene.  While it is not clear from the record whether defendants were aware that plaintiff could not read, because they were cooperating with Detective Fisher in the investigation and because Detective Fisher must have known that plaintiff could not read when he obtained his statement, an inference could be drawn that defendants knew plaintiff did not read and could not understand his written statement, but included information contained therein in the warrant application anyway.

Such behavior would thus support a finding of intentional conduct
or reckless disregard for the truth.

Such a finding could also be inferred from the statements
defendants made to plaintiff that "irregardless of guilt," they
"delivered two names to the Mayor's Office for the alleged legal
violation discovered at West Side Middle School on May 16, 2002"
and the "Mayor's Office picked and returned [plaintiff's] name to
them and that is the reason why [plaintiff] was being
prosecuted," and that "[s]omeone is going to have to take the
fall for this, because this is not allowed to happen," see Pl.
Interrogatory Responses [Doc. # 29-3, g] ¶ 11, because a jury
could conclude based on this evidence that the arrest warrant was
sought for reasons other than prosecution of a perpetrator.[3]
Additionally, malice can be inferred from a want of probable
cause.  See Vandersluis v. Weil, 176 Conn. 353, 356 (1978)

_____

[3] Although defendants argue – at least in the malicious
prosecution context – that defendant Aybar did not participate in
the warrant application and/or prosecution of plaintiff – these
statements, and the suggestion that Aybar was involved in the
delivery of two names to the Mayor's Office in connection with
the alleged violations, where plaintiff states that Aybar was
aware that plaintiff had not worked at the School for several
weeks prior and did not have supervisory responsibility, are
sufficient for summary judgment purposes to support an inference
that Aybar was involved in the decision to seek to arrest
plaintiff.  Cf. Zenik v. O'Brien, 137 Conn. 592, 596 (Conn. 1951)
(in malicious prosecution context, "[a] person is deemed to have
initiated a proceeding if his direction or request, or pressure
of any kind by him, was the determining factor in the officer's
decision to commence the prosecution [or] the defendant's request
might reasonably have been found to be the proximate and
efficient cause of the arrest.").

("Malice may be inferred from lack of probable cause. . . . The want of probable cause, however, cannot be inferred from the fact that malice was proven.").

### C.   Malicious Prosecution

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment . . . and establish the elements of a malicious prosecution claim under state law." Fulton v. Robinson, 289 F.3d 188, 195 (2d Cir. 2002).  "Under Connecticut law, a plaintiff seeking to recover for malicious prosecution must prove the following: (1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice."  Galazo v. City of Waterbury, 303 F. Supp. 2d 213, 218 (D. Conn. 2004) (citing McHale v. W.B.S. Corp., 187 Conn. 444, 447 (Conn. 1982)). Satisfaction of the second element does not appear to be in dispute.

Defendants dispute the first element as to defendant Aybar, and the third and fourth elements as to both defendants.  As to the first element, as noted above (see supra note 3), although Aybar did not sign the warrant application, reading the evidence

in the light most favorable to the plaintiff, given that Aybar participated in the investigation and in light of the suggestion that Aybar was involved in the delivery of two names to the Mayor's Office in connection with the alleged violations after having been told that plaintiff had not worked at the School for several weeks prior to the incident and did not have supervisory responsibility, the evidence could support an inference that Aybar was involved in the decision to seek to prosecute the plaintiff.  See Zenik, 137 Conn. at 596 ("A person is deemed to have initiated a proceeding if his direction or request, or pressure of any kind by him, was the determining factor in the officer's decision to commence the prosecution [or] the defendant's request might reasonably have been found to be the proximate and efficient cause of the arrest.").

As to the third and fourth elements, although as noted above the issuance of a warrant to arrest plaintiff creates a presumption of probable cause, plaintiff has adduced sufficient evidence to undermine that presumption and lead to an inference that probable cause was lacking.  Further, also as detailed above, there is sufficient evidence in the record to suggest that defendants intentionally omitted relevant information about plaintiff – such as the facts that Scarpa had purchased and stored the hazardous materials and that plaintiff had not been working at the School and didn't have supervisory responsibility

23

- from the warrant application and did so with malice in pursuit of some political agenda, as illustrated by defendants' comments to plaintiff that "someone is going to have to take the fall for this, because this is not allowed" and that "irregardless of guilt," they delivered two names to the Mayor's Office to select one person to "take the fall" and the Mayor's Office selected plaintiff and that is the reason he is being prosecuted.  See Pl. Interrogatory Responses ¶ 11.  Further, as noted supra, malice may be inferred from a lack of probable cause.

**D.   Qualified Immunity**

As noted above, an arresting officer will be entitled to qualified immunity if there was "arguable probable cause" for an arrest, defined to exist when: "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence would disagree on whether the probable cause test was met."  Escalara v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004).  Reading the evidence in the light most favorable to the plaintiff, the Court cannot conclude based on this record that it was objectively reasonable for defendants to believe that probable cause existed, or that reasonable officers would disagree on whether there was probable cause to arrest plaintiff for the claimed violations where another individual admitted guilt, which admission plaintiff corroborated, and given that defendants knew plaintiff had not been working at the School

24

around the time of the incident and had been told by plaintiff that he had no supervisory responsibilities at the School.

As an alternative to their qualified immunity affirmative defense, defendants argue that they are entitled to "personal immunity" pursuant to Conn. Gen. Stat. § 29-298(b), which provides "[a]ny officer of a local fire marshal's office, if acting without malice and in good faith, shall be free from all liability for any action or omission in the performance of his official duties."  However, as set out above, there is evidence in the record from which the jury could conclude defendants were acting with malice and, accordingly, summary judgment must be denied.

### E.   Summary

Accordingly, the Court finds that there is sufficient evidence in the record to support a verdict for plaintiff on both his false arrest and malicious prosecution claims and that defendants have not established that they are entitled to qualified immunity or personal immunity as a matter of law.

## IV.  CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment [Doc. # 20] is DENIED.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton
United States District Judge
**Dated at New Haven, Connecticut this 7th day of September, 2006.**